**UNITED STATES of America**

**v.**

**Travis Paul ENMONS et al.**

**Crim. No. 1918.**

United States District Court,
E. D. Louisiana,
Baton Rouge Division.

Dec. 16, 1971.

Gerald J. Gallinghouse, U. S. Atty., E. D. Louisiana, Julian R. Murray, Jr., Joseph R. McMahon, Jr., Asst. U. S. Attys., New Orleans, La., for the United States.

Sam J. D'Amico, D'Amico, Curet & Bush, Alex W. Wall, Dodd, Hirsch, Bar-ker, Avant & Wall, Baton Rouge, La., for defendants.

E. GORDON WEST, Chief Judge:

Defendants have been indicted for alleged violations of the Hobbs Act, 18 U. S.C.A. § 1951. They have moved to dismiss the indictment on the ground that the acts alleged therein do not constitute a federal offense under that act.

Briefly stated, three of the defendants were members of the International Brotherhood of Electrical Workers Union, Local 390, and one was a member of Local 2286 of the same union. The indictment charges them with conspiring to obstruct, delay, and affect commerce by extortion in violation of the Hobbs Act. The indictment particularly charges that:

"9. It was a part of said conspiracy that the defendants and the co-conspirators would obtain the property of the Gulf States Utilities Company in the form of wages and other things of value with the consent of the Gulf States Utilities Company, its officers and agents, such consent to be induced by the wrongful use of actual force, violence and fear of economic injury by said defendants and co-conspirators in that defendants and the co-conspirators did commit acts of physical violence and destruction against property owned by the Gulf States Utilities Company in order to force said Company to agree to a contract with Local 2286 of the International Brotherhood of Electrical Workers calling for higher wages and other monetary benefits."

The indictment then charges the defendants with certain overt acts designed to cause the malfunctioning of transformers and to damage other property belonging to Gulf States Utilities Company. The defendants, in support of their motion to dismiss the indictment, take the position that the Hobbs Act, which makes it a federal crime to obstruct, delay, or affect interstate commerce by robbery or extortion, simply does not in-

clude acts of violence which might occur while employees are in the process of picketing an employer in furtherance of some lawful labor objective such as securing higher wages for persons employed by the employer pursuant to a collective bargaining agreement. The defendants would distinguish this type of violence from that which is designed to extract from an employer by violence or threats of violence, money or property for which nothing is given in return, and to which the extorter is not entitled, such as wages for unnecessary and unwanted employees. The defendants argue that the Hobbs Act has never been held to include, and was never intended to include, activities, even though unlawful under State law, which have for their purpose the securing of higher wages for legitimate employees who are parties to a lawful collective bargaining agreement.

The Government, on the other hand, would interpret the Hobbs Act much more broadly. Their interpretation would include in the definition of "property" (1) higher wages sought by collective bargaining, and (2) the company's "right to negotiate" the wage questions without unlawful interference.

While there is, as far as this Court can determine, no definitive jurisprudential answer to this dispute, and while there is, in the legislative background of the Hobbs Act, inferences at least to support both sides, this Court, nevertheless, concludes that the Hobbs Act was not intended by the Congress to have the broad application for which the Government contends. This is not to say that there could not be cases in which violence or threats of violence which occur during labor disputes could be prosecuted under the Hobbs Act. It is to say, though, that under the circumstances of this case, the indictment does not charge an offense punishable under the Hobbs Act. The caveat contained in Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), is apropos the present situation:

"The spirit of the doctrine which denies to the federal judiciary power to create crimes forthrightly admonishes that we should not enlarge the reach of enacted crimes by constituting them from anything less than the incriminating components contemplated by the words used in the statute."

The pertinent parts of the Hobbs Act under which defendants were indicted, read as follows:

"(a) Whoever in any way or degree obstructs, delays, or affects commerce, or the movement of any article or commodity in commerce, by robbery or extortion or attempts to conspire so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined \* \* \*.

(b) As used in this section \* \* \*

"(1) \* \* \*

"(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U. S.C.A. § 1951.

Section (b) (3), then, in effect, defines "commerce" to mean interstate commerce.

■■ In the case before us, the defendants were union members who were on strike against their employer, Gulf States Utilities Company. The main purpose of the strike was to secure higher wages for Gulf States employees. In the course of the strike, violence apparently erupted. It is alleged that the defendants either individually or in conspiracy, one with the other, caused damage to certain transformers and other property of Gulf States Utilities Company by firing into said property with high powered rifles or by draining oil out of certain transformers for the purpose of causing them to malfunction. There is no suggestion that the strike itself was illegal, nor is there any sugges-

tion that the object of the strike, i. e., to secure higher wages from Gulf States Utilities Company was an illegal objective. The only question presented is whether or not the acts with which defendants are charged constituted "extortion" as contemplated by the Hobbs Act. We think they do not. The Hobbs Act grew out of the case of United States v. Local 807, etc., 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004 (1942), which involved a prosecution brought pursuant to the Anti-Racketeering Act of June 18, 1934, 18 U.S.C.A. § 420(a). That statute made it a crime when:

> "Any person who, in connection with or in relation to any act in any way or in any degree affecting trade or commerce, or any article or commodity moving or about to move in trade or commerce—(a) obtains or attempts to obtain, by the use of or attempt to use or threat to use force, violence, or coercion, the payment of money or other valuable consideration, or the purchase or rental of property or protective services, *not including, however, the payment of wages by a bona-fide employer to a bona-fide employee; * * *"* (Emphasis added.)

The question involved was whether or not the *exemption* contained in the statute applied only to one who had attained the status of a bona fide employee prior to the time of the alleged violent acts aimed at seeking payment of wages, or whether the exemption also applied to one seeking to become a bona fide employee at the time the acts complained of were committed. The United States Supreme Court held that the latter category was also included within the exemption on the ground that these activities formed a part of regular activities of labor unions, and that the Congress did not intend to impair the ordinary, lawful activities of unions, one of which was to seek work for its members as well as to seek more favorable wages for people already employed. Shortly after this decision, the Hobbs Act was introduced as H.R. 6872 of the 77th Congress, 2d Session. In its final form the pertinent provisions of that Act read as hereinbefore set forth. It will be noted that in the language of the Hobbs Act, the exclusion pertaining to wages found in the Anti-Racketeering Act was omitted. But it is further noted that instead of making it a crime to use threats or force, etc., in order to obtain "the payment of money or other valuable consideration," the Hobbs Act used what appears to be more restrictive language and made it a crime to "obstructs, delays, or affects commerce" by "robbery or extortion." Hence, under the Hobbs Act, in order to constitute a crime, one must obstruct, delay, or affect interstate commerce or attempt or conspire to do so, by "robbery or extortion," whether or not physical violence, or threats of physical violence to persons or property is used. While at first blush it might appear that by passage of the Hobbs Act Congress intended to broaden the prior act by eliminating the exclusion pertaining to wages, a closer look leads to the conclusion that even though the wage exemption was eliminated, the actual scope of the crime was narrowed in other respects. Under the Hobbs Act, in order to constitute a federal offense, the defendant must be shown to have resorted to "robbery or extortion" to accomplish his design. In his testimony before the House Sub-Committee considering his bill, Congressman Hobbs explained it this way:

> "* * * Here, the prime purpose is not to punish a criminal for his crime against State law, but rather to punish interference with interstate commerce by robbery or extortion. This bill would invoke the aid of the federal authorities to prevent the commission of these crimes and to protect interstate commerce.

> "In the second place, I wish to call your attention to the fact that the elements of the crimes discussed by this bill are essentially the same as the elements of robbery or extortion. The only added element is interference with interstate commerce." Hearings

before Sub-Committee No. 3 of House Committee on the Judiciary, 77th Congress, 2d Session, pp. 426–427.

Hence, "robbery" or "extortion" were made essential elements of the crime, and "extortion" was defined in the statute as:

"The obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C.A. § 1951(b) (2).

Since we are, of course, bound by this express definition of extortion, we thus narrow the issue here to whether or not these defendants have, in fact, been charged with the "obtaining of property from another" in violation of the Act. The indictment charges that the defendants did, and conspired to do the things proscribed by the Act "by extortion, as that term is defined in Section 1951 of Title 18, United States Code, * * *." It then charges generally that the "property" which defendants extorted was "in the form of wages and other things of value with the consent of Gulf States Utilities Company * * * such consent to be induced by the wrongful use of actual force, violence and fear of economic injury * * *." It then elaborates a bit by saying not that wages or other property was obtained, but simply that unlawful violence or threats of violence was used "in order to force said company to agree to a contract with Local 2286 of the International Brotherhood of Electrical Workers calling for higher wages and other monetary benefits." The remainder of the indictment simply enumerates specific acts of violence allegedly perpetrated by defendants in furtherance of their conspiracy to extort.

 In its brief in opposition to defendants' motion to dismiss the indictment, the Government says that:

"Generally the 'property' is the higher wages which were to be obtained from Gulf States Utilities Company as a result of the acts of violence and destruction which were perpetrated. Additionally, the Government contends that the 'property' obtained from Gulf States Utilities Company was its right to negotiate employment contracts and to conduct business in an open market without illegal disruption and interference with commerce associated therewith."

We cannot conclude, in this case, that these things constituted either the "property" or the "extortion" contemplated by the Hobbs Act. We find no case where a court has gone so far as to hold the type of activity involved here to be a violation of the Hobbs Act. If the wages sought by violent acts are wages to be paid for unneeded or unwanted services, or for no services at all, there is good authority for the conclusion that such would constitute the extortion prohibited by the Act. Thus, in United States v. Kemble, 3 Cir., 198 F.2d 889, cert. den. 344 U.S. 893, 73 S.Ct. 211, 97 L.Ed. 690 (1953), the Court said:

"In these circumstances, the conclusion seems inescapable that Congress intended that the language used in the 1946 statute be broad enough to include, in proper cases, the forced payment of wages. We say 'in proper cases' advisedly. For it is not necessary that we here consider the great variety of circumstances in which coercion may be involved in the payment of wages. We need not consider the normal demand for wages as compensation for services desired by or valuable to the employer. It is enough for this case, and all we decide, that payment of money for imposed, unwanted and superfluous services such as the evidence shows Kembel attempted to enforce here by violent obstruction of commerce is within the language and intendment of the statute."

But as noted, the Court did not conclude that in all cases where coercion was used in connection with the demand for wages a federal offense would be involved. And again, in United States v. Sweeney, 262 F.2d 272 (CA 3—1959),

the Court, recognizing that all acts of violence in connection with wage demands may not constitute a violation of federal law said:

"We need not decide in this case how far concerted employee activity through a union, accompanied by violence or threats thereof, is exempted from the act. The reason we do not need to meet this question is that here we do not find evidence in Sweeney's conduct of union activity. The conference at the Pittsburgh hotel, above described, was conducted by representatives of the union and representatives of the employer. An agreement was reached. There was, so far as we know, no violence or threats of violence at that amicable meeting. The activities of Sweeney seem to have been self-prompted according to the testimony. He ignored the agreement reached and forced another one by violence on the employer."

In order for there to have been a violation of the Hobbs Act here we would have to find that the defendants obtained, or attempted to obtain, or conspired to obtain "property" from Gulf States Utilities Company, with its consent, but by use of actual or threatened force or violence. It is the opinion of this Court that neither the wages of bona-fide employees nor the "right to negotiate employment contracts—without illegal disruption" constitute "property" as contemplated by the Hobbs Act. The union had a right to disrupt the business of the employer by lawfully striking for higher wages. Acts of violence occurring during a lawful strike and resulting in damage to persons or property are undoubtedly punishable under State law. To punish persons for such acts of violence was not the purpose of the Hobbs Act. As stated by Congressman Hobbs:

"* * * Here, the prime purpose is not to punish a criminal for his crime against state law, but rather to punish interference with interstate commerce by robbery or extortion."

The acts of violence with which these defendants are charge are not approved or condoned, and it would be a miscarriage of justice if State prosecution did not follow in their wake. But these acts simply did not constitute the "obtaining of property from another" that is contemplated by the Hobbs Act.

For these reasons the defendants' motion to dismiss this indictment will be granted, and a judgment and order will be entered accordingly.